# THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CERRO FABRICATED PRODUCTS LLC, :
                             :
           **Plaintiff,**      :
                             :      **3:17-CV-02422**
    **v.**                        :      **(JUDGE MARIANI)**
                             :
**GEORGE SOLANICK,**          :
                             :
           **Defendant.**     :

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

Presently before the Court is Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 6).

On December 29, 2017, Plaintiff, Cerro Fabricated Products, LLC, (hereinafter "Cerro") filed a Complaint against its former employee, Defendant George Solanick, asserting Misappropriation of Trade Secrets under 12 Pa.C.S.A. § 5301, *et seq.* (Count I) and Breach of Confidentiality Agreement (Count II). (Doc. 1).[1] Plaintiff thereafter filed a Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 6) and brief in support of the motion (Docs. 6, 16), to which Defendant filed a brief in opposition (Doc. 19). Plaintiff's Motion requests the following relief:

> A. Defendant be temporarily and preliminarily enjoined and restrained from using or disclosing to any person any Confidential Information and trade

---

[1] Plaintiff filed an Amended Complaint on January 25, 2018 (Doc. 33). The Amended Complaint only differed from the original Complaint with respect to two paragraphs (¶¶ 1, 34) and did not materially alter the substance of the two Counts against Defendant.

Doc. 33, at ¶¶ 1, 2, 4; *see also,* Doc. 39 (Joint Report by the parties agreeing that "[t]here is no dispute as to subject matter jurisdiction")).

2. Federal Rule of Civil Procedure 65 governs the issuance of a preliminary injunction.[5] In ruling on a motion for a preliminary injunction, the Court must consider: "'(1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief; (3) the extent to which the non-moving party will suffer irreparable harm if the injunction is issued; and (4) the public interest.'" *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC,* 511 F.3d 350, 356-57 (3d Cir. 2007) (quoting *Shire U.S. Inc. v. Barr Labs. Inc.,* 329 F.3d 348, 352 (3d Cir. 2003)).

3. When requesting preliminary equitable relief, the movant "must meet the threshold for the first two 'most critical' factors: it must demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly v. City of Harrisburg,* 858 F.3d 173, 179 (3d Cir. 2017). If these two "gateway factors" are met, a court should then consider the other two factors and determine "in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.*

---

[5] The standard for granting a preliminary injunction under Rule 65 is the same as that for issuing a TRO. *Pileggi v. Aichele,* 843 F.Supp.2d 584, 592 (E.D. Pa. 2012) (citing *Bieros v. Nicola,* 857 F.Supp. 445, 446 (E.D. Pa. 1994)).

4. "District courts have the freedom to fashion preliminary equitable relief so long as they do so by 'exercising their sound discretion.' . . . Indeed, '[t]he essence of equity jurisdiction has been the power of the [court] to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it.'" *Reilly*, 858 F.3d at 178-179 (internal citations omitted).

5. "[A] determination of whether to grant injunctive relief in a trade secrets case and, if so, the proper scope of the relief, depends on a highly fact-specific inquiry into the situation in the case the court is considering . . . ." *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 113 (3d Cir. 2010).

## A. Plaintiff's Likelihood of Success on the Merits

6. Plaintiff's Amended Complaint asserts a claim for Misappropriation of Trade Secrets pursuant to the Pennsylvania Uniform Trade Secrets Act ("PUTSA") (Count I) and a claim for Breach of Confidentiality Agreement (Count II). However, the Court notes that the "Invention, Conflict of Interest, Confidentiality Policy and Agreement" which appears to form the basis of Plaintiff's breach of contract claim and arguably is applicable to Plaintiff's Misappropriation claim, specifically states that:

> This Agreement shall be construed, and the relationship between the parties determined, in accordance with the laws of the State of Illinois, notwithstanding any choice-of-law principle that might dictate a different governing law. Each party irrevocably agrees, consents and submits to jurisdiction and venue in the federal and state courts located in Cook County, Illinois, with respect to any dispute arising out of or relating in any way to this Agreement.

(Confidentiality Agreement, at 2). Plaintiff's brief in support of its motion only cites to Pennsylvania law with respect to both counts and Defendant has not argued that this Court should not apply Pennsylvania law when determining whether Plaintiff has a likelihood of success on the merits on its misappropriation of trade secrets claim or on its breach of the confidentiality agreement claim.[6] Nonetheless, to the extent that an argument could be made that Plaintiff's Misappropriation of Trade Secrets claim should have been brought pursuant to Illinois law, "there is no conflict between the trade secret analysis laws of Illinois and Pennsylvania . . . . In both states, the definitions of trade secret and misappropriation thereof are derived from the same source – Restatement (First) of Torts, § 757 (1939)." *First Health Gp. Corp. v. Nat'l Prescription Adm'rs, Inc.*, 155 F.Supp.2d 194, 217 n.4 (M.D. Pa. 2001). Under Pennsylvania's choice of law rules, a court must first look to see whether a true conflict exists, and in the absence of a conflict, the court may apply Pennsylvania law. *Scirex Corp. v. Fed. Ins. Co.*, 313 F.3d 841, 847 n.1 (3d Cir. 2002). Because there is no conflict in the trade secret analysis laws of Illinois and Pennsylvania, any differences between the laws of these two states will not affect the outcome of this case and Pennsylvania law may apply to Cerro's trade secrets claim. However, as to the breach of the confidentiality agreement claim, although no party has argued otherwise, because the Confidentiality Agreement forms the basis for Count II of

---

[6] At best, Defendant notes in passing that although Cerro's motion "advances only Pennsylvania law", "had Cerro attempted to apply Illinois law, per Solanick's Agreement, the same result would be reached as under Pennsylvania law (that no trade secrets exist)." (Doc. 19-1, at 11 n.3).

Plaintiff's Amended Complaint, to the extent that the Court deems the Agreement to be enforceable, a choice of law analysis may dictate that Illinois contract law be applied.[7]

<u>Misappropriation of Trade Secrets under 12 Pa.C.S.A. § 5301, *et seq.*</u>

7. Plaintiff Cerro bears the burden of proving the existence of a trade secret. *Iron Age Corp. v. Dvorak*, 880 A.2d 657, 663 (Pa. Super. Ct. 2005).

8. Under the PUTSA, a trade secret is defined as follows:

> Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:
> (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12 Pa.C.S.A. § 5302.

9. A trade secret does not need to be "technical in nature" to be fully protected by Pennsylvania law. *Bimbo Bakeries*, 613 F.3d at 112. Rather, a trade secret

> "may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers."

---

[7] For reasons discussed *infra* this Court will not engage in a substantive analysis of the Breach of Confidentiality Agreement; thus the Court need not presently determine which state law applies to Count II. Nonetheless, the parties are on notice that the Court expects this issue of law to be addressed at the appropriate time.

*Rohm and Haas Co. v. Lin*, 992 A.2d 132, 143 (Pa. Super. Ct. 2010) (quoting *Tyson Metal Prods., Inc. v. McCann,* 546 A.2d 119 (Pa. Super. Ct. 1988)).

10. To be considered a trade secret, the "information must be an employer's actual secret and not comprise mere 'general trade practices.'" *Iron Age Corp.*, 880 A.2d at 664. In other words, "in order to be protected, trade secrets must be the particular secrets of the complaining employer, not general secrets of the trade in which he is engaged." *Renee Beauty Salons, Inc. v. Blose-Venable*, 652 A.2d 1345, 1348-1349 (Pa. Super. Ct. 1995).

11. A trade secret "does not include a worker's aptitude, skill, dexterity, or his manual and mental ability." *Iron Age Corp.*, 880 A.2d at 663.

12. In determining whether information is protected as a trade secret, Pennsylvania Courts look to the following factors: (1) the extent to which the information is known outside of the company's business; (2) the extent to which the information is known by employees and others involved in that company's business; (3) the extent of measures taken by the company to guard the secrecy of the information; (4) the value of the information to the company and to the company's competitors; (5) the amount of effort or money expended by the company in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or

duplicated by others. *Crum v. Bridgestone/Firestone North American Tire, LLC*, 907 A.2d 578, 585 (Pa. Super. Ct. 2006). [8]

13. Despite Campbell's assertion to the contrary (*see* Campbell Test., at 134-135), Cerro's list of purported trade secrets contained in its Amended Complaint (Doc. 33, ¶ 11) and reiterated in Campbell's Declaration (Def. Ex. 4, at ¶ 7) is overly broad and non-specific and inappropriately incorporates a large majority of Cerro's business. However, upon review of the case law and the testimony presented at the evidentiary hearing, particularly that of Bucher and Solanick, certain information asserted by Cerro does constitute trade secrets.

14. In determining what information is protected as a trade secret, the Court affords Bucher's testimony substantial weight due to his numerous years at Cerro, experience in the industry, and general demeanor and candor at the evidentiary hearing. The Court also affords Solanick's testimony considerable weight for largely the same reasons, although mindful of Solanick's personal interest in the outcome of the hearing. With respect to Campbell, the Court does not give his testimony as much weight or consideration as that of Bucher or Solanick due to Campbell's very limited time with Cerro, and his lack of knowledge and experience in the forging business prior to joining Cerro, although we do note Campbell's business and

---

[8] Although the PUTSA displaced Pennsylvania's common law tort for misappropriation of trade secrets, "there is no indication that the statute effected a substantive shift in the definition of 'trade secret.'" *Bimbo Bakeries*, 613 F.3d at 109 n.7 (3d Cir. 2010) (quoting *Youtie v. Macy's Retail Holding, Inc.*, 626 F.Supp.2d 511, 522 n. 10 (E.D.Pa. 2009)).

management experience in "metals" and take such experience into consideration when evaluating what may constitute confidential information in business.

15. The evidentiary hearing revealed two areas where it is undisputed by Cerro and Solanick himself that the information at issue constitutes trade secrets. Bucher and Campbell both discussed the needed confidentiality of information regarding pricing and margins, and Solanick admitted that he "would not use any of the pricing information" and that he "shouldn't be discussing margins" (*see* Solanick Test., at 178, 180). Thus, Solanick in essence admitted the confidential nature of this information and the strong possibility that its disclosure would negatively impact Cerro's business.

16. Bucher explained that only a few people had an understanding of Cerro's cost structure and margins. Within a company of over 100 employees, this represents only a small number of senior employees who were privy to this information. Further, both Bucher and Campbell made clear that this type of information is not publicly available and would be highly valuable to a competitor.

17. Cerro's efforts to guard the secrecy of its purported confidential information or trade secrets were not extensive. At no time during his employment at Cerro was Solanick asked to sign a restrictive covenant, non-solicitation agreement, or non-compete agreement. Further, it cannot be said that Cerro's security measures identified by Bucher and Campbell, most if not all of which appear to have only been implemented

recently, are strict or comprehensive. However, Cerro's Confidentiality Agreement shows a clear intent by Cerro to identify certain information as confidential and secret and ensure that any employee of Cerro who obtained the information "retain[ed it] in confidence during [his/her] employment and thereafter." (*See* Confidentiality Agreement, at 1-2).

18. Campbell stated that the time and expense that it took to develop "this" information is "hundreds of thousands of dollars" (Campbell Test., at 125). Although Campbell did not clarify what specific information he was referring to in estimating this monetary value, including whether this was limited to trade secrets or all information needed for Cerro to successfully develop its business, this testimony is further proof of the difficulty, and cost, for other companies to gain certain information in this "niche" and competitive market, and the potential value of such information.

19. Plaintiff has met its burden of proving that the following information constitutes trade secrets for purposes of preliminary injunctive relief in this action:

   a. Pricing. Confidential "pricing" consists of how Cerro prices, its strategy in determining pricing, the company's internal costs and rates, including any unpublished price lists, and Cerro's margins to which it prices. The company's costs include the cost of labor and cost of its processes used during production.

   b. Margins. Cerro's confidential information regarding margins is defined as the amount of money Cerro is able to make when deducting the total cost

(including but not limited to the cost of the product, metal, labor, and overhead) from the sales revenue Cerro makes off any given product. The confidential nature of "margins" also includes the precise profitability of specific products and the costs of goods sold.

c. Internal financial information. Such information includes Cerro's internal financial and accounting data, operating costs, and any other financial information not publicly disclosed or otherwise available.

d. Manufacturing methods and techniques. Any such method or technique that is not commonly used within the forging industry and is not otherwise known or available outside of Cerro.

e. Inventions and designs. Although Cerro provided little to no evidence of proprietary designs or inventions within the Company, to the extent that any exist, this information is confidential.

f. "Pipeline" information. This confidential information includes prospective markets that Cerro is attempting to penetrate and prospective business and customers that Cerro is attempting to obtain. Encompassed within this definition is necessarily Cerro's long term strategy that it has developed, as well as any internal and confidential steps Cerro may be taking, to accomplish these goals.

g. Cerro's list of single-source customers which is not otherwise publicly available or subject to disclosure through the normal course of business within the industry. This also includes the amount of business Cerro may do with this customer, the specific type of business, and the profitability of such business.

h. To the extent not already included in the other trade secrets identified by the Court, Cerro's internal marketing plans, strategic plans, and business plans.

20. Having found that the above-listed information constitutes trade secrets, the Court turns to the issue of misappropriation of these trade secrets.[9]

21. Cerro contends that it has a "strong likelihood of success on the merits of its misappropriation claim because Cerro can demonstrate that Defendant acquired knowledge of trade secrets by virtue of Defendant's employment with Cerro under circumstances giving rise to a duty to maintain confidentiality, and Defendant is now in a position to use or disclose such trade secrets." (Doc. 16, at 10).

22. A threatened or actual misappropriation of a trade secret may be enjoined by a Court. *See* 12 Pa. C.S.A. § 5303.

23. A court may enjoin "the threatened disclosure of trade secrets without requiring a plaintiff to show that disclosure is inevitable." *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 111 (3d Cir. 2010).

---

[9] The Court's identification of specific trade secrets should in no way be interpreted as a finding that Solanick is not bound by the terms of his Confidentiality Agreement with Cerro or that Solanick should not comply with any contractual obligations that may exist pursuant to that Agreement.

24. When determining whether to grant an injunction to prevent the threatened disclosure of a trade secret, the proper inquiry is "whether there is sufficient likelihood, or substantial threat" that the individual will use or disclose the trade secrets. *Den-Tal-Ez, Inc. v. Siemens Capital Corp.*, 566 A.2d 1214, 1232 (Pa. Super. Ct. 1989).

25. As applicable to the present action, Solanick misappropriated a trade secret if he disclosed or used a trade secret of Cerro without express or implied consent and "at the time of the disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." *See* Pa. C.S.A. § 5302.

26. Pennsylvania law provides that "a person may be enjoined from engaging in employment or certain aspects of his employment where that employment is likely to result in the disclosure of information, held secret by a former employer, of which the employee gained knowledge as a result of his former employment situation." *Air Prods. and Chems., Inc. v. Johnson*, 442 A.2d 1114, 1120 (Pa. Super. Ct. 1982). Thus, "the issue . . . is not whether [Cerro] took precautions to stop the disclosure of information, i.e., restrictive covenant, but whether [Cerro] possessed information which qualifies as trade secrets and whether a confidential relationship existed between [Cerro] and [Solanick] such that [Solanick] was prohibited from disclosing trade secrets revealed to him during the existence of that confidential relationship to a future employer." *Id.*

27. There is no direct evidence that Solanick has, or has attempted to, disclose any of Cerro's trade secrets since beginning work at Brass Aluminum. Although Plaintiff points to circumstantial evidence, such as losing Anderson's business and the incomplete bid submitted to Polaris/Lincoln, both Campbell and Bucher admitted that they could not definitively say that Solanick was responsible for telling Anderson that Cerro was no longer interested in the firearms industry, and Bucher not only admitted that the incomplete bid was a "mistake", but that he was partially responsible since he "combined in the mistake" with Solanick. Furthermore, there is no evidence that Solanick took any documents, confidential or otherwise, or information in any other tangible form, when he left Cerro. The limited evidence set forth by Plaintiff would require this Court to make large inferential leaps in order to find that Solanick has already misappropriated any trade secrets. Plaintiff has thus not set forth sufficient evidence which could allow this Court to find that Solanick has already disclosed any of Cerro's trade secrets or other confidential information to Brass Aluminum or any customers/potential customers of Cerro or used any such information in his position at Brass Aluminum.

28. However, despite the fact that there is insufficient evidence to find Solanick has already used or disclosed any of Cerro's trade secrets, there still remains a sufficient likelihood that Solanick may disclose the Company's trade secrets in the near future during his employment with Brass Aluminum.

29. The record demonstrates that Cerro and Brass Aluminum are direct competitors in a narrow and niche market, and that there is a high likelihood that the two companies will repeatedly find themselves in the position of soliciting the same prospective customers, working with the same existing customers, and bidding on the same projects.

30. There are a number of similarities between Solanick's job at Brass Aluminum and his prior job at Cerro. In both positions, Solanick was/is a salesperson responsible for obtaining and maintaining business from the same limited group of customers/ potential customers for the same types of products and services. The significant overlap between these two positions in such a competitive and narrow market, with limited business opportunities, increases the likelihood that certain trade secrets may be disclosed in the course of business.

31. Even in the absence of evidence that Solanick took any documentation from Cerro, as both Bucher and Campbell persuasively testified, by virtue of Solanick's time and positions at Cerro, he intellectually possesses, or is likely to possess, a significant amount of confidential information, including certain trade secrets, about Cerro in his memory. This information cannot simply be erased from Solanick's memory. However, upon review of the testimony presented at the evidentiary hearing, as well as the nature of the trade secrets, it is this Court's opinion that Solanick is capable of compartmentalizing any confidential information relating to Cerro, and avoiding its use when performing his job duties at Brass Aluminum. Nonetheless, despite this finding,

because Defendant has not presented any evidence of any steps that Solanick or Brass Aluminum have taken or intend on taking in order to prevent the disclosure of any of Cerro's trade secrets or confidential information, the Court still finds that there is a sufficient likelihood that Solanick may disclose a trade secret such that limited preliminary injunctive relief is necessary.

32. For the foregoing reasons, Plaintiff has met its burden of demonstrating that it has a likelihood of success on the merits of its Misappropriation of Trade Secrets claim.

## Breach of Confidentiality Agreement

33. Plaintiff's only direct reference to its Breach of Confidentiality Agreement claim (Count II) in its brief in support of its motion for injunctive relief is found in a footnote, wherein Plaintiff states that "Cerro has a likelihood of success on its claim for breach of the confidentiality agreement" because "it is clear that an agreement existed between the parties[; t]hat agreement imposed a duty of confidentiality on Defendant, who is now working for a direct competitor in what Cerro believes is a similar position to the one he held at Cerro[; and] Cerro has been informed that since resigning, Defendant is using and/or disclosing Cerro's Confidential Information to aid Brass Aluminum in soliciting Cerro's customers." (Doc. 16, at 16 n. 4). This brief and generalized assertion fails to satisfy Plaintiff's burden of demonstrating a likelihood of success on

the merits.[10] Although Plaintiff made a slight effort in its Reply brief to address the

Breach of Confidentiality Agreement claim (*see* Doc. 26, at 14-15), the few arguments

raised therein are inappropriately set forth for the first time in the Reply brief, and

regardless, still lack the requisite specificity necessary for Plaintiff to prevail in its

attempt to obtain injunctive relief on this claim. Further, it cannot reasonably be

disputed that the majority, if not the entirety, of the evidentiary hearing focused on the

existence and nature of Cerro's trade secrets and the purported threatened

misappropriation of those trade secrets. As a result of Plaintiff's failure to set forth the

necessary case law, evidentiary information, or substantive argument for this Court to

adequately assess the merits of Count II of Plaintiff's Amended Complaint, Plaintiff

has failed to meet its burden of showing a likelihood of success on the merits of its

Breach of Confidentiality Agreement claim.

34. Because Plaintiff has largely failed to brief or otherwise argue the merits of its Breach

of Confidentiality Agreement claim, and the Court will find that Plaintiff is entitled to

preliminary injunctive relief with respect to the threat of disclosure or misappropriation

of a number of trade secrets, as well as the fact that the trade secrets and protections

of certain information in the confidentiality agreement overlap to a large extent, the

---

[10] It also must be noted that Plaintiff set forth <u>no</u> evidence to support an assertion that they were "informed" that Defendant is using and/or disclosing Cerro's confidential information to aid Brass Aluminum.

Court declines to otherwise address Cerro's likelihood of success on the merits on its Breach of Confidentiality Agreement claim.[11]

## B. Extent to Which Cerro will Suffer Irreparable Harm if Injunctive Relief is Denied

35. Irreparable harm "must be of a peculiar nature, so that compensation in money alone cannot atone for it." *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990) (citing *Morton v. Beyer*, 822 F.2d 364, 372 (3d Cir. 1987)).

36. "[A]n intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost certainly show immediate irreparable harm." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92-93 (3d Cir. 1992). *See also, Neo Gen Screening, Inc. v. TeleChem Intern., Inc.*, 69 F. App'x 550, 554-555 (3d Cir. 2003) (collecting cases: "*Compare [BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.,* 229 F.3d 254, 263 (3d Cir. 2000)]* (where witness testified that if defendants used trade secrets they illegally obtained from BP in building their plant they would damage BP's reputation, its credibility and ability to license its technology, such injuries were difficult to calculate and money damages would be inadequate); . . . . *FMC Corp. v. Taiwan Tainan Giant Indus. Co.,* 730 F.2d 61, 63 (2d Cir. 1984) (holding that loss of trade secrets was an irreparable harm that could not be measured in money because 'a trade secret once lost is, of course, lost forever'); *with Acierno [v. New Castle County,* 40 F.3d 645, 647 (3d Cir. 1994)]* (reversing grant of preliminary injunction

---

[11] The Court will thus also not address Count II with respect to the other factors necessary to obtain preliminary injunctive relief.

compelling county to issue a building permit because plaintiff would not suffer irreparable harm by delaying building and injunction did not maintain the status quo).").

37. Plaintiff contends that because Solanick "is working in a similar role for a direct competitor . . . it is inevitable he will use and disclose Confidential Information of Cerro" and such disclosure would result in irreparable harm. (Doc. 16, at 7-8).

38. The facts that Solanick is currently employed at Brass Aluminum, a competitor of Cerro in a narrow market with limited projects and customers within the industry, engaging in business with some of the same customers as he worked with at Cerro, and where Brass Aluminum is in competition with Cerro to both retain customers and gain new customers as well as to obtain new projects, and such competition is both presently occurring and will continue to occur, the Court finds that the threat of misappropriation is imminent.

39. Here, the industry in which Cerro and Brass Aluminum work is narrow and competitive, wherein, as Bucher explained, margins can be "very tight" and there is a challenge to be "very effective" in order to be competitive. In this environment, the disclosure of one or more trade secrets could make a significant impact on Cerro's ability to compete with Brass Aluminum or other companies in the same business. For example, the disclosure of Cerro's trade secrets could allow Brass Aluminum to improve or otherwise alter the technology it uses and the processes it applies, as well

as allowing Brass Aluminum to solicit clients and/or projects of which they may have previously been unaware or unable to anticipate. Brass Aluminum would also be in a stronger position to predict how Cerro's capabilities, strengths, and weaknesses can be used to Brass Aluminum's advantage, including how Cerro would respond to certain requests for quotes, and therefore modify its own bids accordingly.

40. Campbell was unable to state with any specificity how much business or business opportunities Cerro would lose if Solanick disclosed Cerro's purported trade secrets, explaining that the amount of any losses depends on how many customers Cerro would lose if Solanick used certain information that he knew about Cerro, which in turn would impact Cerro's ability to employ people and turn a profit. Thus, Campbell's testimony makes clear that some of Cerro's damages can be quantified in monetary terms.

41. Nonetheless, compensation in money alone cannot atone for all of the damages that Cerro may suffer as a result of any misappropriation of trade secrets. As explained, because both Cerro and Brass Aluminum are competitors in a narrow and niche market, any information gained as the result of the disclosure of one or more of Cerro's trade secrets would give Brass Aluminum a critical advantage in securing and maintaining business. Any unlawful disclosure further may result in the loss of business opportunities or market advantage. The disclosure of Cerro's trade secrets undoubtedly puts Cerro at a competitive disadvantage vis-à-vis Brass Aluminum and

any of its other competitors in the industry. This disadvantage is difficult, if not impossible, to quantify in terms of financial damages and is therefore incapable of being adequately remedied through the use of other legal means. Additionally, the variety of ways that Solanick could use the above-identified trade secrets while employed at Brass Aluminum are so subtle and intertwined with other non-trade secret factors that attempting to impose a remedy solely in the form of monetary damages is very likely to be met by the insurmountable obstacle of an inability to quantify what damages flow from the unlawful disclosure or use of trade secrets in any transaction in which Solanick participates.

42. As a result, the Court finds that it is more likely than not that Cerro will suffer imminent and irreparable harm in the absence of preliminary relief.

**C. Extent to Which Solanick will Suffer Irreparable Harm if Injunction is Issued**

43. Cerro requests that Solanick "be temporarily and preliminarily enjoined and restrained from using or disclosing to any person any Confidential Information and trade secrets of Cerro and from violating the terms of the Confidentiality Agreement", as well as "be[ing] temporarily and preliminarily enjoined and restrained from directly or indirectly working for or providing services or information to Brass Aluminum or any other direct competitor of Cerro." (Doc. 6, at 11-12).

44. Here, there is no evidence that Solanick will suffer any harm if he is enjoined from revealing Cerro's above-listed trade secrets and confidential information. In

41

particular, there is no evidence that Solanick would lose his job at Brass Aluminum or be demoted in any way if he is enjoined from revealing the information found by this Court to constitute a trade secret. Even if Solanick did suffer some form of undetermined harm, such harm is certainly outweighed by the harm Cerro would suffer if one or more of its trade secrets were revealed.

45. However, Solanick would suffer significant harm if enjoined from working at Brass Aluminum or other direct competitor of Cerro as Plaintiff requests.

46. "[E]ven a temporary injunction prohibiting someone from pursuing his livelihood in the manner he chooses operates as a severe restriction on him that a court should not impose lightly." Bimbo Bakeries, 613 F.3d at 119.

47. Solanick credibly testified that he would have difficulty finding a position outside the forging industry because, despite his years of work experience, he does not have a Bachelor's degree or Master's degree. Furthermore, at 53 years old, it would be unreasonable to expect Solanick to return to school or attempt to develop a new skill set or expertise in an industry outside of which he has worked for the majority of his professional life.[12] The Court also takes into consideration Solanick's right to pursue the profession of his choice, at the company of his choosing. Solanick's right to do so

---

[12] Plaintiff suggests that Solanick "can work anywhere in the vast field of aluminum manufacturing outside this narrow niche market" and that Solanick "is free to use [his] experience to find employment anywhere but Cerro's direct competitors." (Doc. 43, at 7). Nonetheless, Plaintiff has not presented any evidence to rebut Solanick's assertion that it is difficult to find employment due to his lack of a degree, nor has Plaintiff provided this Court with reason to believe that there are jobs available in "the vast field of aluminum manufacturing" that Solanick would be able to obtain.

should not be infringed on in the absence of any direct evidence from Plaintiff that enjoining Solanick from working at Brass Aluminum is the only way to prevent the disclosure of trade secrets.

48. Additionally, even a temporary injunction preventing Solanick from working at Brass Aluminum while this case proceeds would constitute a significant hardship on Solanick. In this Court's experience, a case such as this may take over a year to proceed to trial, even if the parties agree to an expedited case management schedule, and, should Defendant file any dispositive motions, this may further prolong the adjudication of this action. It would be a substantial hardship on Solanick to be unemployed for this significant period of time or be forced to attempt to find a new position at a different company when there is no evidence that he would be capable of obtaining a comparable job. It is further unreasonable to believe that Solanick has the financial means to be unemployed for any lengthy duration of time.

## D. Public Interest

49. The Third Circuit has made clear that in a case such as this, it is not necessary for a district court "to engage in extended analysis of the public interest – extensive precedent supports an injunctive remedy where the elements of a trade secret claim are established." *SI Handling Sys. v. Heisley*, 753 F.2d 1244, 1265 (3d Cir. 1985); *see also, Bimbo Bakeries*, 613 F.3d at 119 (citing approvingly to this statement in *SI Handling*).

43

50. However, "there is a public interest in employers being free to hire whom they please and in employees being free to work for whom they please" and "Pennsylvania courts consider the right of the employee to be more significant." *Bimbo Bakeries*, 613 F.3d at 119.

51. Here, the general public interest in "upholding the inviolability of trade secrets and enforceability of confidentiality agreements", *Bimbo Bakeries USA, Inc. v. Botticella*, 2010 WL 571774, *16 (E.D. Pa. 2010) weighs in favor of granting Plaintiff limited injunctive relief enjoining Solanick from revealing Cerro's trade secrets. However, the public interest, including the risk of causing an employee significant economic harm and preventing him from engaging in his chosen profession, as well as preventing an employer from hiring the person of its choice, weigh against any injunctive relief barring Solanick from working for any period of time.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that Plaintiff has met its burden with respect to its entitlement to certain preliminary injunctive relief. Plaintiff has demonstrated that it has a likelihood of success on the merits with respect to its claim for misappropriation of trade secrets and that it is more likely than not to suffer irreparable harm in the absence of some preliminary injunctive relief. On balance, these two factors, in conjunction with the extent to which Defendant would suffer irreparable harm and the public interest, balance in favor of granting limited preliminary injunctive relief to Cerro. Plaintiff's Motion for

44

Temporary Restraining Order and Preliminary Injunction (Doc. 6) will therefore be granted in part and denied in part as set forth in this memorandum opinion.[13]

A separate order follows.

Robert D. Mariani
United States District Judge

---

[13] Given the breadth of the injunctive relief in that it covers general categories such as pricing, margins, manufacturing methods and techniques, and internal financial information, the parties are on notice that should there be further proceedings to enforce the injunction or for contempt based on an alleged failure to comply with the injunction, neither party should expect to be successful either in the prosecution or defense of its position unless the "trade secret" at issue in such a proceeding is defined with considerably more specificity than that which the parties have provided to the Court thus far.

secrets of Cerro and from violating the terms of the Confidentiality Agreement;

B. Defendant be temporarily and preliminarily enjoined and restrained from directly or indirectly working for or providing services or information to Brass Aluminum or any other direct competitor of Cerro;

C. Defendant be temporarily and preliminarily enjoined and restrained from contacting customers of Cerro, regarding the purchase of any products or services of any kind or nature provided or sold by Cerro for a period of time deemed proper by the Court to protect Cerro's trade secrets and preclude them from being misappropriated and from assisting Brass Aluminum or another Cerro competitor in doing so;

D. Defendant be ordered immediately to preserve and return to Cerro any Confidential Information of Cerro, and all copies thereof, in whatever form stored or maintained, including any list or compilation of customer information maintained by Defendant and preserve all electronic information in his possession or control pertaining to Cerro or his current or prospective employment with Brass Aluminum . . . .

(Doc. 6, at 11-12).[2]

---

[2] More concisely, Cerro explains in its brief in support of its Motion that it is seeking a TRO and preliminary injunction enjoining Solanick from doing the following:

- Directly or indirectly using, or disclosing, to any person, any of the Confidential Information (as defined in the Civil Complaint) of Cerro and from violating the terms of Defendant's Confidentiality Agreement;
- Directly or indirectly working for or providing services or information to Brass Aluminum or any direct competitor of Cerro;
- Directly or indirectly contacting customers of Cerro, or any of their agents or employees, for Defendant's own account or in the service of others, regarding the provision of any services, advice, assistance, or products of any kind or nature provided or sold by Cerro' firearms segment.

(Doc. 16, at 1-2).

On January 26, 2018, the Court held an evidentiary hearing on Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction. Following the hearing, the parties each filed a supplemental brief in support of their respective positions (Docs. 42, 43).

Plaintiff's motion having been fully briefed and a preliminary injunction hearing having been held, the motion is now ripe for disposition. For the reasons that follow, Plaintiff's motion for preliminary injunctive relief will be granted in part and denied in part as set forth in this memorandum opinion and the accompanying order.

## II. FINDINGS OF FACT

1. Tony Campbell, Cerro's President, John Bucher, Cerro's Product Development Manager, and Defendant George Solanick, each testified at the evidentiary hearing held on January 26, 2018.

2. Solanick obtained a degree in Tool Design Technology from Williamsport Area Community College (now the Pennsylvania School of Technology). He then began working at Garland Commercial Industries in 1984 and earned an Associate's degree in Business from Penn State while working at Garland. At Garland, Solanick was an industrial engineer, and "worked at setting up assembly lines and working on manufacturing processes for sheet metal." Solanick voluntarily left Garland in 1988 and went to work for Mideast Aluminum, which later became Sapa. During his 23 years at Mideast Aluminum/Sapa, Solanick had the following jobs, in chronological order: (1) Engineering Estimator where he "would do costing on jobs, quotes coming

3

in, developed the processes, developed the tooling"; (2) Fabrication Supervisor; (3) New Product Development, where he was responsible for any new projects that the company launched and worked to coordinate the projects within the facility and with the customer; (4) General Manager, the highest level at the facility. Solanick left Mideast Aluminum/Sapa voluntarily in 2011 to work for Cerro. (Solanick Test., at 145-149, 152; *see also*, Solanick Resume, Pl. Ex. 4).

3. Mideast Aluminum/Sapa, was a manufacturing facility. The company only worked with aluminum and extruded components for several firearms manufacturers. The only machine that Mideast Aluminum/Sapa did not have which Cerro did have was a forge machine. (Solanick Test., at 148-149).

4. Solanick was recruited to work at Cerro by a former employee of Sapa who was an executive at Cerro's parent company. (Solanick Test., at 149-150).

5. Cerro's manufacturing operation and offices are in Weyers Cave, Virginia. (Campbell Test., at 111).

6. Cerro currently has "just over 100 employees" and "well-over" 100 customers. (Campbell Test., at 111, 117, 124).

7. Cerro is a "forging and machining operation providing aluminum brass components into a number of end user markets", which include firearms, power sports, defense safety, and other industrial-type companies. (Bucher Test., at 20).

8. At Cerro, Solanick's first job was Plant Manager/General Manager. After six months in this position, Solanick became Firearms General Manager and handled the firearm and power sports equipment half of the company. Bucher ran the other half of what he termed the "collectum," which was the industrial-type product line. Solanick was subsequently promoted to President of Cerro and served in that capacity for approximately one year. Solanick then assumed the role of a Technical Sales Segment Manager. (Solanick Test., at 151-155, 158).

9. At the time Campbell and Solanick worked together at Cerro,[3] Solanick worked remotely from his home in Pennsylvania. (Campbell Test., at 111).

10. Solanick signed an "Invention, Conflict of Interest, Confidentiality Policy and Agreement" ("Confidentiality Agreement", Pl. Ex. 1) on January 25, 2017.

11. In the section entitled "Confidential Information and Trade Secrets", the Confidentiality Agreement states:

> I will retain in confidence during my employment and thereafter any and all confidential information and trade secrets belonging to, developed by, licensed to or in the possession of the Company or its affiliates which may come into my possession during my employment. I understand and agree that the phrase "confidential information and trade secrets" includes, but is not limited to, the following:
>
> - Inventions, discoveries, processes, methods, designs and improvements not yet patented or published, computer source code, and research and development data.

---

[3] Campbell joined Cerro on October 10, 2017 (Campbell Test., at 112, 132).

- Business information such as product costs, vendor and customer lists, lists of approved components and sources, unpublished price lists, production schedules, business and marketing plans, sales figures and other financial information not yet announced or publicly disclosed.

- Any other information not generally available to the public or to competitors of the Company or its affiliates which, if disclosed, would materially damage the Company or its affiliates or would aid or benefit a competitor.

I will not do any of the following acts with respect to such confidential information and trade secrets without the consent in writing of the Company, either during my employment or thereafter: (1) communicate such confidential information or trade secrets to any other person, firm, association or corporation, or (2) use such confidential information or trade secrets for the private benefit of myself or for the benefit of any other person, firm, association or corporation.

All materials of any nature whatsoever that belong to the Company (whether prepared by me or by others) which relate to the products or business of the Company, shall remain the sole property of and shall be returned to the Company upon termination of my employment.

(Confidentiality Agreement, at 1-2).

12. Solanick did not sign any non-compete agreement other than the Confidentiality Agreement which prohibited him from "directly solicit[ing] or attempt[ing] to solicit employees of the Company: (1) to leave its employ, or (2) to accept employment with any person or company whose business in any way competes with that of the Company" (Confidentiality Agreement, at 2). The restriction on soliciting or attempting to solicit employees of Cerro is not at issue in the present motion.

6

13. The Confidentiality Agreement does not contain an agreement not to solicit customers of Cerro. (*See generally*, Confidentiality Agreement).

14. Cerro never asked Solanick to sign a restrictive covenant or other non-compete or non-solicitation agreement. (*See* Solanick Test., at 152, 154, 155, 158).

15. Campbell was hired as President of Cerro in October, 2017. (Campbell Test., at 112, 132). Despite only working at Cerro for four months at the time of the evidentiary hearing, Campbell explained that the basis for his information and knowledge in this case is the result of "interactions with other people in the facility, it's reading emails, it's looking at documents, it's a full gamut, it's not time-based, it is information based." (*Id*. at 133).

16. Bucher has been in "the industry", and worked for Cerro, for over 30 years. (Bucher Test., at 27-28; 75). Bucher has worked in Cerro's sales department for over 10 years.

17. In Bucher's current position as Product Development Manager, he "develop[s] new business and maintain[s] business, existing business." Prior to Solanick's departure from the company, Bucher shared this position with Solanick. (Bucher Test., at 18).

18. Bucher and Solanick were both market segment sales managers at Cerro. In this capacity, Solanick tried to penetrate and develop business in the firearms and power sports market segments and Bucher focused on aluminum brass specialty, which included all other business segments other than those covered by Solanick. (Bucher

Test., at 19). Since Solanick's departure from Cerro, Bucher has assumed responsibility for the firearms side of the business. (*Id.* at 48).

19. Bucher described the industry in which Cerro is competing as a "narrow" and "niche" market wherein finding customers "takes penetration, sometimes a lot, to develop those relationships and develop knowledge of who would use [Cerro's] products." (Bucher Test., at 35).

20. Cerro is in a "competitive business" in terms of pricing, quality of parts, and performance of deliveries. (Bucher Test., at 36).

21. The firearms component market has had a number of "ups and downs" over the last ten years. (Bucher Test., at 76). When the firearms market is down, Cerro tries to reduce costs. (*Id.*). Bucher admitted that in his experience with Cerro, the company "was always evaluating [its] business" and at times this included trying not to do business with certain firearms customers. (*Id.* at 81-82). Sometime during Jim Napick's tenure as President of Cerro, which was from 2014 to 2017, there was a down market with firearms, and Napick was challenged to reduce the firearm customer base, which caused Cerro to fire "lots of customers" who eventually went to competitors of Cerro, including Brass Aluminum Forging Enterprises, LLC ("Brass Aluminum"). (Solanick Test., at 160-161). According to Solanick, as a result of firing so many customers, for two years at Cerro he dealt with comments about Cerro not wanting to be in the firearm industry. (Solanick Test., at 162). Further, Campbell

confirmed that, as President, he challenged Cerro's involvement in the firearms industry, but that is "not where we landed" and Cerro continues to invest in the firearms industry. (Campbell Test., at 115).

22. Solanick stated that he "know[s] manufacturing" and therefore "it doesn't matter if you put me in a sheet metal plant, a forging plant or a machine shop." (Solanick Test., at 151). Solanick admitted that he did not have any forging manufacturing experience prior to working for Cerro. (*Id*. at 185). In Bucher's opinion, Solanick's resume (Pl. Ex. 4) "clearly indicates a strong experience in extrusion but limited exposure to the whole forging process." (Bucher Test., at 33). Bucher further opined that, exclusive of the raw material, the extrusion manufacturing process does not have anything to do with the business in which Cerro is engaged. (*Id*. at 34). Bucher acknowledged that when Solanick started at Cerro, Solanick was knowledgeable about the manufacturing process "as a whole" and had experience in how to operate a large plant. (*Id*. at 80).

23. Cerro asserts that the following information constitutes confidential information and trade secret information:

(a) confidential information as to pricing, margins, customer proposals, pricing strategies, product differentiation, competitive intelligence, and positioning and bidding strategies;

(b) product costs, vendor and customer lists, lists of approved components and sources, unpublished price lists, production schedules, business and marketing plans, sales figures and other financial information not yet announced or publically disclosed;

(c) marketing plans, strategic plans, business plans, costs of services, profitability of various products, and internal financial information (including but not limited to from which products Cerro derives its revenue from a customer, what products are being provided to a customer, and which products are the most profitable);

(d) product capabilities, functionality, features, and designs, and sourcing strategies to maintain competitive costs;

(e) bids, proposals, presentations, sales pipeline information and information concerning customers and potential customers and their needs and requirements (including but not limited to identity, revenue, volume, profitability as to each product and overall, requirements, needs, preferences, concerns, plans, experiences, and key contacts and decision-makers), and customer lists and prospects;

(f) research and development projects, and new products, product enhancements, and services being developed and business plans and strategies;

(g) financial and accounting data, operating costs, and costs of goods sold; and

(h) manufacturing methods and techniques; and

(i) methods of operation, technologies, inventions, and designs.

(Amended Compl., Doc. 33, at ¶ 11; Decl. of Campbell, Def. Ex. 4, at ¶ 7).

24. On cross-examination, Campbell was unwilling to admit that the above-alleged trade

secrets "touch upon just about every aspect of Cerro's business", arguing that:

You don't mention my employees, you don't mention the experience of my employees, you have not mentioned the size of my facility, you've not mentioned other key factors of our business that are also part of our business, so this doesn't touch everything.

(Campbell Test., at 134-135). Campbell did not elaborate on what "other key factors" may consist of within his company.

25. Bucher stated that "secret information" about Cerro's business which he would not want competitors to know about included:

    a. "[T]he pricing side of the business [ ] how we price and the strategy of pricing. Components of that would be cost, our internal costs, and also our margins to which we will price to." (Bucher Test., at 37; *see also*, *id*. at 39).

    b. Pricing, which includes rates and capabilities of rates, which is "critical" to understanding what quantities Cerro can produce by an operation. (*Id*. at 39).

    c. Components of "cost", which would be material, including the types of material used, and labor and the process itself. (*Id*. at 41).

    d. The "pipeline", which is prospective business, and includes "customers, specific part numbers that we may be penetrating, maybe markets, and within that development, then we also would understand there's a spectrum of near completion and just starting the project." The "pipeline" is "critical" to Cerro as it develops its long term strategy, which includes determining the advantage of aluminum versus brass and different types of market segments to penetrate. (*Id*. at 38-39).

    e. The company's strategy, i.e., where Cerro "want[s] to go and who the customers are that we would like to penetrate" and maintain. This includes the

company's current customer base and Cerro's contacts with those customers.

(*Id.* at 42; *see also*, *id.* at 44).

f. The temperature "that can be worked on internally." (*Id.* at 41).

26. Bucher gave the following equivocal and noncommittal answers with respect to the

following alleged trade secrets and/or confidential information:

a. In response to Attorney Poplstein's question whether "there [are] any special

types of methods that you use in manufacturing parts such as that that would

be, basically, something that is considered secret within your operation",

Bucher replied:

So in the forging process, it *could be* things such as tool steel, die design, it *could* also be the lubrication that is used in forging, in the forging process, and *sometimes those are unique* to the forging operation.
Lubrication could depend on the design of the part, so oftentimes, it takes a lot of experience, from the forge personnel, to understand the design of the parts which is the best lubrication to use that could be unique to parts and design the parts.

(Bucher Test., at 23) (emphasis added). *See also*, *id.* at 40, 95 (stating that

the lubrication process and lubrications that Cerro uses "*could be*" another

type of "secret information") (emphasis added).

b. Butcher admitted that "it's as much of an art as a science in producing the

parts." (*Id.* at 24).

12

c. In response to Attorney Poplstein's question whether Cerro "developed any type of special manufacturing methods, in relation to the manufacture and production of a forged aluminum part", Bucher replied:

So tooling and processing, *maybe*, which machines we may run our product on *may be unique to us*, though, someone else may run the same product. So there are some unique characteristics that we would have.

(*Id*. at 25-26) (emphasis added).

27. Bucher later explained that:

[t]he concerns that I might have [about Solanick working for Brass Aluminum] is the knowledge that was taken and learned at Cerro that could provide an advantage that otherwise would not be available. . . . [I]n the forging industry, it's a process, it's a science, but it's as much of an art. And Mr. Solanick being president had access to a lot of information and detailed information that most folks do not. So [ ] in terms of being able to – for him to know our customer base, our processes, it's quite a unique insight into one of the chief competitors of Cerro Fabricated Products.

(Bucher Test., at 74).

28. Campbell testified that he agreed with Bucher's list of what constitutes a trade secret for Cerro. (Campbell Test., at 116). Campbell elaborated on the following:

a. He is concerned that information with respect to what direction he is going to take the company in, which includes important internal discussions and strategy-related discussions, will become public. (*Id*. at 116).

13

b. With respect to strategy regarding margins[4], profits, and costs, he viewed the following information as confidential: whether Cerro is making money, and how much; whether the company can execute well financially; its long term capital outlook; and investments in the company. (*Id.* at 116).

c. Knowledge of the customer and the company's ability to respond to the information they have about the customer. (*Id.* at 117).

d. The identity of Cerro's single source customers is "highly valuable." (*Id.* at 118).

e. *See also*, Declaration of Tony Campbell (Def. Ex. 4, at ¶ 7) (outlining the information and trade secrets that Cerro contends are confidential).

29. Campbell further explained:

> I would be very concerned that any conversations that [Solanick] would have, related to pricing, competitive advantage and those sorts of things, just having been a part of Cerro Fabricated Products, he would have an understanding of where we would typically fall, and then we would be learning at his new facility where they do fall and would be able to recognize the gap, if there is one.

(Campbell Test., at 124).

30. With respect to what constitutes confidential information and trade secrets, Solanick admitted the following:

---

[4] Campbell defined the term "margins" as follows:

You take the total cost of the product, metal, labor, etc., overhead, all those things, you call that your cost, total cost, and then you have your price is the gap, so how much money do you make off of it?

(Campbell Test., at 126).

a. That he "would not use any of the pricing information." (Solanick Test., at 178).

b. That he "shouldn't be discussing margins." (*Id.* at 180).

31. However, Solanick testified that Bucher's identification of pricing, processes, and margins as trade secrets are inapplicable because Brass Aluminum is a different plant, which has different processes and has its own machines and equipment, and develops its own quotes based on its own cost structure. (Solanick Test., at 179).

32. Working with the bidding, quoting, and estimating for parts is "a learned skill", which Bucher testified took him a number of years to develop. (Bucher Test., at 70). These skills include understanding costs and knowing what the rates, prices, and margins should be on a given product. (*Id.* at 70-71).

33. With respect to the estimating process, the sales department would:

take that part, which would have a print, the specifications of a customer and quantity. We would send a request for a quote to our Estimating Department, Sales would send[ ] that to the Estimating Department. Estimating would then coordinate with engineering all the cost factors involved, material, labor, processing. They would accumulate those costs along with overheads, develop an estimate for that part number, submit that estimate to sales, sales then reviews it and establishes a margin that we would think would be proper for that part, and then submit the price to the customer.

(Bucher Test., at 41-42).

34. As members of the sales force, Bucher and Solanick had access to information regarding profits, sales, and margins. (Bucher Test., at 42-43). According to Bucher only "a few [people] really have a complete understanding of the cost structure,"

15

which includes the company's "cost of our product to process that." (*Id.* at 45). Within the company, sales personnel, including Bucher, Solanick, and another sales employee, the President, and "maybe a couple other senior key executives", all have an understanding of Cerro's cost structure and margins. (*Id.* at 46).

35. Bucher testified that he "shared most anything" with Solanick, including pricing, margins, penetration, where the opportunities were, and thoughts in how to grow "in a very narrow and niche market." (Bucher Test., at 52).

36. According to Campbell, from a macro standpoint, Solanick had access to Cerro's profit and loss-type statements and "anything related to sales dollars, [and] margins", and from a micro standpoint, Solanick had access to the specific jobs he worked on and the financial information for those jobs. (Campbell Test., at 111).

37. Cerro "recently" instituted "some additional securities for some of the segments" that it is trying to penetrate, such as identification cards to access the building and password protected computers. (Butcher Test., at 47). Cerro also has a network that is backed-up and firewalls to prevent unauthorized access; "RFID badges" which allow people to get into the facility; and a locked front reception area. (Campbell Test., at 118-119).

38. Anderson was a client of Cerro for "years" and was Cerro's largest customer in 2015, 2016, and 2017. (Bucher Test., at 48-49). Brass Aluminum was also a supplier of the same parts to Anderson. A week or two after Solanick's departure from Cerro,

Bucher called Anderson and learned that Anderson "had removed their business from Cerro" and were under the impression "that Cerro was not as interested in the firearms industry and supplying into the firearms industry as Brass Aluminum." (*Id.* at 49-51). Bucher did not know where Anderson got the information that formed this impression. (*Id.* at 51). Similarly, Campbell stated that he could not say that Solanick told Anderson that Cerro was leaving the firearms industry. (Campbell Test., at 132). Solanick denied ever telling anyone at Anderson that Cerro was out of the firearms business. (Solanick Test., at 162).

39. On October 25, 2017, Cerro was approached by Lincoln Industries for a quote on four parts/components for Polaris that the company needed. On November 7, 2017, Cerro submitted a quote to Lincoln Industries for the parts/components. Although the request for a quote indicated that Lincoln Industries was requesting a quote for forge, trim, and machine, the paperwork submitted by Solanick to the Engineering and Estimating department(s) was only for forge work on the four parts. (Bucher Test., at 56-60; *see also,* Pl. Ex. 6, 7). By way of explanation for the discrepancy, Solanick testified that he "missed it." (Solanick Test., at 171).

40. On November 6, 2017, prior to the quote for Lincoln Industries being submitted, Solanick forwarded an email to Bucher, which included (1) the request for quote, developed by an estimator at Cerro, (2) the original email from an employee at Lincoln Industries setting forth the request for a quote on all four parts/components

and what work Lincoln Industries wanted done on the parts, and (3) four "RFQs", one for each part/component requested. (Pl. Ex. 6). Upon receipt of the email, Bucher "collected it, reviewed it with Mr. Solanick", established a price, and submitted "the official RFQ to the customer." (Bucher Test., at 63; *see also*, Pl. Ex. 7). Bucher stated that he believed that he and Solanick "combined in the mistake" in only submitting a partial quote to Lincoln Industries. (*Id*. at 87).

41. Based on an email Bucher saw on January 9, 2018, he concluded that Brass Aluminum "was submitting a quote for the same parts that Cerro had received back on October 25th, but Brass Aluminum was submitting a quote that was in compliance." (Bucher Test., at 66 (referring to Pl. Ex. 5)).

42. Neither Lincoln Industries nor Brass Aluminum through Lincoln Industries, won the bid from Polaris. (Bucher Test., at 91).

43. Solanick resigned from Cerro on October 30, 2017. (Solanick Test., at 165; *see also*, Solanick Resignation Letter, Pl. Ex. 3).

44. Campbell first learned, while traveling, that Solanick was resigning when Solanick called him and told him that he was on his way to the plant to resign his position. When Campbell asked Solanick where he was going, Solanick told him it was personal. (Campbell Test., at 120). Similarly, when Bucher asked Solanick where he was going or what he was going to do, Solanick told Bucher that he could not tell him at that time. (Bucher Test., at 53).

45. Following his conversation with Solanick, Campbell asked Solanick to stay for two weeks to give Bucher transition time. Campbell testified that if he had known that Solanick was going to work for a competitor, he "believe[s]" that he would have handled the situation differently, and that his "feeling is I wouldn't have allowed him to continue." (Campbell Test., at 121, 123).

46. Solanick's last day at Cerro was November 14, 2017. (Solanick Test., at 165-166). During the two week period from the time he submitted his resignation letter to his last day of work, Solanick worked extensively with Bucher and tried to teach him about the firearms and power sports market. (Bucher Test., at 53). During that period, Bucher recollects that he was sending out quotes and responses to quotes, but would "bounce" them off Solanick. (*Id.* at 54-55).

47. Brass Aluminum is a competitor of Cerro. (Campbell Test., at 119). Solanick began working at Brass Aluminum immediately after leaving Cerro.

48. At the time Solanick left Cerro, he had not held the position of President of Cerro for over two years. (Solanick Test., at 167).

49. Jim Radovich is a former salesperson for Cerro who then worked for Anchor Harvey, a competitor of Cerro, and now works for Brass Aluminum. Bucher admitted that Radovich "would have been aware of a number of Cerro's firearm manufacturing customers." (Bucher Test., at 79).

50. Solanick is now a technical salesperson at Brass Aluminum. (Solanick Test., at 175-176). Additionally, if the President of Brass Aluminum goes on vacation, Solanick "step[s] in." (*Id*. at 185).

51. Brass Aluminum has not placed any restrictions on information that Solanick may, or may not, use in his current job. (Solanick Test., at 177).

52. Solanick gave Brass Aluminum a copy of the Confidentiality Agreement he signed at Cerro. (Solanick Test., at 191).

53. Cerro learned in November, 2017, that Solanick was working for Brass Aluminum. (Campbell Test., at 128).

54. On December 4, 2017, Cerro, through legal counsel, sent a cease and desist letter to Solanick entitled "Your Legal and Contractual Violations Against Cerro Fabrication." (Def. Ex. 13-A). The letter "demand[s] that [Solanick] comply with [his] legal and contractual obligations to Cerro Fab and that [he] cease and desist from any further disclosure and use of Cerro Fab's confidential and proprietary information." (*Id*. at 2).

55. On December 8, 2017, Solanick responded to the cease and desist letter, stating:

> I have not taken any confidential and proprietary information from [Cerro]. Nor have I shared any confidential and proprietary information with anyone. Lastly, I have not used any confidential and proprietary information of Cerro Fab.
> Just so that you are aware, all confidential and proprietary information that I had in my possession at the time of my termination was returned to the Company at the time of my departure. And, when I left, I did not retain any copies or electronically stored information that was confidential and proprietary to the Company.

(Def. Ex. 14). At the hearing, Solanick testified that these were true statements. (Solanick Test., at 169-170).

56. Solanick denied telling anyone at Brass Aluminum any secret information, or information that he regarded as secret, about any of Cerro's processes, procedures, financial information, pricing, or profit margins. (Solanick Test., at 167-168).

57. Solanick denied removing any information from Cerro when he left regarding lubrication, pricing, the pipeline, estimating, customers, sales information, profit information, or financial information. (Solanick Test., at 166-167). Solanick also returned his company issued laptop and cellphone. (*Id.* at 167).

58. Bucher has no evidence that Solanick took any documents with him relating to pricing, rates, margins, lubrications, or information about Cerro's pipeline, when he left Cerro. (Bucher Test., at 97-99).

59. Campbell admitted that he has no evidence, documentation or otherwise, that Solanick has disclosed confidential information to Brass Aluminum or anyone else, but stated that he has, as evidence, "activities that have happened in the market place that have affected our business." (Campbell Test., at 131).

60. Campbell stated that the time and expense that it took to develop "this" information is "hundreds of thousands of dollars." (Campbell Test., at 125). Campbell did not clarify what specific information he was referring to in estimating this monetary value and admitted that he was new to the company. (*Id.* at 125-126).

61. Solanick's job at Brass Aluminum is his only source of income. (Solanick Test., at 173).

62. Solanick would have difficulty finding a position outside the forging industry because, despite his years of work experience, he does not have a Bachelor's degree or Master's degree. (Solanick Test., at 173-174).

63. Campbell was unable to state how much business or business opportunities Cerro would lose if Solanick disclosed Cerro's purported trade secrets. Campbell stated that it depended on how many customers Cerro lost as a result of Solanick's use of the information he knew about Cerro, which in turn would impact Cerro's ability to employ people and turn a profit. (Campbell Test., at 124).

64. At the time Solanick left Cerro, the company employed approximately 115 employees. Since that time, "some" employees "have exited" and the company has not replaced them. (Campbell Test., at 110-111). Cerro now has "just over 100 employees." (*Id.* at 111). Neither Campbell nor Bucher explained why these individuals are no longer employed at Cerro or why Cerro has not replaced the former employees.

### III. CONCLUSIONS OF LAW

1. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a). The amount in controversy exceeds $75,000 and complete diversity exists as the plaintiff, Cerro, is a Delaware limited liability company with a principal place of business in Virginia, and the defendant, Solanick, is a citizen of Pennsylvania. (*See*